**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| MICHAEL WATKINS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BARNHART CRANE AND RIGGING CO., and BARNHART CRANE AND RIGGING, LLC,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Michael Watkins ("Plaintiff"), on behalf of himself and all others similarly situated, states as follows for his class action complaint against Defendants, Barnhart Crane and Rigging Co., and Barnhart Crane and Rigging, LLC ("Barnhart" or "Defendants"):

## INTRODUCTION

1. On or about April 3, 2025, Defendants lost control over their computer network and the highly sensitive personally identifiable information[1] ("PII") and protected health information ("PHI" and collectively with PII, "Private Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), stored thereon in a data breach perpetrated

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

by cybercriminals (the "Data Breach"). Upon information and belief, the Data Breach has impacted 22,822[2] of Defendants' current and former clients and employees.

2. The notorious "Akira"[3] and "Chaos"[4] ransomware gangs have claimed responsibility for the Data Breach, and they have posted that they possess sensitive Private Information stolen from Defendants on their dark web leak sites.

3. Upon information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity, failed to adequately monitor their agents, contractors, vendors, and suppliers in handling and securing the Private Information of Plaintiff, and failed to maintain reasonable security safeguards or protocols to protect the Class's Private Information—rendering it an easy target for cybercriminals.

4. Defendants' failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their Private Information.

5. Defendants knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of Private Information misuse.

6. In failing to adequately protect its clients' and employees' information, and by failing to adequately notify them about the breach, Defendants violated state law and harmed

---

[2] *See Data Breach Notices*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/4d3b12cf-de52-4b14-ad76-68de73d453f4.html (last visited May 27, 2026).

[3] *Barnhart*, RANSOMWARE.LIVE, https://www.ransomware.live/id/QmFybmhhcnRAYWtpcmE (last visited May 27, 2026).

[4] *Barnhart*, RANSOMWARE.LIVE, https://www.ransomware.live/id/QmFybmhhcnRjcmFuZS5jb21AY2hhb3M (last visited May 27, 2026).

thousands of its current and former clients and employees.

7. Plaintiff and the Class are victims of Defendants' negligence and inadequate cyber security measures. Specifically, Plaintiff and members of the proposed Class trusted Defendants with their Private Information. But Defendants betrayed that trust. Defendants failed to properly use up-to-date security practices to prevent the Data Breach.

8. Plaintiff is a former employee of Defendants and a Data Breach victim.

9. The exposure of one's Private Information to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiff and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

10. Plaintiff, Michael Watkins, is a natural person and citizen of Arizona. He resides in Gilbert, Arizona where he intends to remain.

11. Defendant, Barnhart Crane and Rigging Co., is a corporation organized under the laws of the state of Delaware with a principal place of business listed as 2163 Airways Blvd, Memphis, Tennessee 38114.

12. Defendant, Barnhart Crane And Rigging, LLC, is a limited liability company organized under the laws of the state of Delaware with a principal place of business listed as 2163 Airways Blvd, Memphis, Tennessee 38114.

13. It is believed that both Defendants are controlled by the same individuals and thus may be treated as one entity for the purposes of this lawsuit, so hereinafter will be referred to as "Barnhart" or "Defendants."

## JURISDICTION & VENUE

14. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of

interest and costs. There are over 100 putative Class Members and Plaintiff and Defendants are citizens of different states.

15. This Court has personal jurisdiction over Defendants because Defendants maintain their principal place of business in this District and do substantial business in this District.

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

***Barnhart***

17. Founded in 1969 in Memphis, Tennessee, Barnhart states it "has grown to be one of the largest heavy lift and heavy transport organizations in North America with more than 70 locations" throughout the United States.[5]

18. Barnhart operates crane rental, rigging services, outage planning, specialized solutions for component replacement, industrial storage and national project cargo logistics.[6] Barnhart further states it has "one of the largest engineering teams in the industry — including a full R&D department — driving innovation across all services."[7]

19. On information and belief, Barnhart accumulates highly sensitive Private Information of its current and former clients and employees.

20. In collecting and maintaining its clients' and employees' Private Information, Barnhart agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their Private Information.

---

[5] *About,* BARNHART, https://www.barnhartcrane.com/about/ (last visited May 27, 2026).
[6] *Id.*
[7] *Id.*

21. Barnhart understood the need to protect its current and former clients' and employees' Private Information and prioritize its data security.

22. Indeed, Barnhart's Privacy Policy states:

a. "When we have no ongoing legitimate business need to process your personal information, we will either delete or anonymize such information, or, if this is not possible (for example, because your personal information has been stored in backup archives), then we will securely store your personal information and isolate it from any further processing until deletion is possible;" and

b. "We have implemented appropriate and reasonable technical and organizational security measures designed to protect the security of any personal information we process."[8]

23. Despite recognizing its duty to do so, on information and belief, Barnhart has not implemented reasonably cybersecurity safeguards or policies to protect clients' and employees' Private Information or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Defendants leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to clients' and employees' Private Information.

***Defendants' Data Breach***

24. On information and belief, Barnhart collects and maintains unencrypted Private Information in its computer systems.

25. On information and belief, from on or around April 23, 2025, to on or around April

[8] *Privacy Policy,* BARNHART, https://www.barnhartcrane.com/privacy-policy/#infosafe (last visited May 27, 2026).

24, 2025, Defendants experienced a Data Breach.[9]

*Cybercriminal Groups Claim Credit for the Data Breach*

26. Worryingly, two separate ransomware groups have claimed responsibility for the Data Breach.

27. One is the infamous cybercriminal group "Akira."

28. Akira is a notorious cybercriminal group that was the subject of a United States Cybersecurity and Infrastructure Security Agency ("CISA") Advisory.[10]

29. In its Advisory, CISA warned organizations that Akira is known to obtain "initial access to organizations through a virtual private network (VPN) service without multifactor authentication (MFA) configured, mostly using known Cisco vulnerabilities."[11]

30. Once it breaks into an organization's network, Akira exfiltrates (*i.e.*, steals) data then encrypts it utilizing a sophisticated hybrid encryption scheme.[12] Akira threat actors use a double-extortion model, demanding a ransom payment to unlock data, and, to further apply pressure, threatening to leak the stolen data on its dark web portal if a ransom payment is not made.[13]

31. Akira is active on the dark web, maintaining two sites – one displaying information about the group and advertising stolen records from data breach victims, and the other for negotiations.[14]

---

[9] *Akira Ransomware Group Targets Barnhart Logistics*, DEXPOSE (Nov. 14, 2025),.
[10] *#StopRansomware: Akira Ransomware*, CISA (Apr. 18, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-109a.
[11] *Id.*
[12] *Id.*
[13] *See id.*
[14] Jaime Andres and Bello Vieda, *A spotlight on Akira ransomware from X-Force Incident Response and Threat Intelligence*, SECURITY INTELLIGENCE (May 2, 2024), https://securityintelligence.com/x-force/spotlight-akira-ransomware-x-force/.

32. On or about November 14, 2025, Akira published a post on one of its dark web websites naming Barnhart.[15]

33. Akira's post stated "Barnhart is a third-party global logistics provider dedicated to delivering customized transportation solutions with a focus on safety and service. We are going to upload company data soon. There are lots of essential corporate documents such as: financial data (audit, payment details, invoices), detailed employees and customers information (Passports, driver's license ,Social Security Numbers, medical information, emails, phones) confidential information, NDAs and other documents with detailed personal information."[16]

34. Akira's post indicates it stole a vast quantity of Plaintiff's and Class Members' sensitive Private Information, including their Social Security numbers.

35. Because the post was created in November of 2025, on information and belief, Plaintiff's and the Class's Private Information has already been uploaded to the dark web.

36. The second group claiming responsibility for the Data Breach is the nefarious "Chaos" ransomware gang.

37. According to RansomLook, an open-source project that tracks dark web activity,[17] on June 5, 2025, Choas created a post on its dark web portal stating that it had hacked Defendants.[18]

---

[15] *See Akira Ransomware Group Targets Barnhart Logistics,* n. 8, *supra*.
[16] *Id.*
[17] *See What is RansomLook,* RANSOMLOOK, https://www.ransomlook.io/about (last visited May 27, 2026).
[18] *Chaos*, RANSOMLOOK, https://www.ransomlook.io/group/chaos (last visited May 27, 2026).




38. Chaos's post contained Defendants' URL, barnhartcrane.com, a description of Defendants' business, the words "Leaked size 360 Gb" and "View count 50."[19] The post also contained a clickable link where, on information and belief, anyone could download the Private Information stolen in the Data Breach.

39. Chaos's post therefore indicates that it stole 360 gigabytes of data from Barnhart in the Data Breach, and, as of the first day of the June 5, 2025, post, the post had been viewed 50 times.

---

[19] *Id.*

40. Chaos operates a "ransomware-as-a-service business" ("Raas") where cybercriminal customers can pay to use Chaos's ransomware software to launch attacks and collect ransoms.

41. According to Cisco Talos, Cisco's threat intelligence research organization,[20] Chaos is a relatively new RaaS group that emerged as early as February 2025.[21] The Chaos group is actively promoting their cross-platform ransomware software in the dark web Russian-speaking cybercriminal forum Ransom Anon Market Place ("RAMP") and is seeking collaboration with affiliates.

42. Chaos is known to use various methods, such as spam flooding and social engineering, to gain access to organizations' network.[22]

43. Once inside, it targets Private Information and uses "rapid selective encryption" to encrypt files and then employs legitimate file-sharing software for data exfiltration.[23]

44. Chaos then demands a ransom payment, threatening to disclose the stolen data of organizations who fail to meet their ransom demands on a "data leak site" it operates.[24]

45. On information and belief, Barnhart has not made any public statements regarding Akira, Chaos, or whether it made a ransom payment.

46. However, even if Defendants made a ransom payment, there is no guarantee that the Private Information stolen in the Data Breach will be deleted.[25] The stolen Private Information

---

[20] *See Home Page*, CISCO TALOS, https://talosintelligence.com/ (last visited Oct. 15, 2025).
[21] Anna Bennett, James Nutland, and Chetan Raghuprasad, *Unmasking the new Chaos RaaS group attacks*, CISCO TALOS (July 24, 2024), https://blog.talosintelligence.com/new-chaos-ransomware/.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.

is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[26]

47. Thus, on information and belief, Plaintiff's and the Class's stolen Private Information has already been published—or will be published imminently—by Akira, Chaos or by other cybercriminals on the dark web.

48. Despite its duties to safeguard Private Information, Defendants did not in fact follow industry standard practices in securing clients' and employees' Private Information, as evidenced by the Data Breach.

*Defendants' Deficient Breach Notice*

49. On or around May 21, 2026—nearly thirteen (13) months after the Data Breach first took place—Defendants finally sent a letter to breach victims (the "Breach Notice") notifying them about the Data Breach.[27]

50. Defendants' delayed notice kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

51. According to the Breach Notice, on April 23, 2025, Barnhart "detected unauthorized access to its network."[28]

52. Barnhart then launched an investigation, which determined that "certain files containing [Plaintiff's and the Class's] personally identifiable information may have been subject to unauthorized access or acquisition.."[29]

53. In other words, Defendants' cyber and data security systems were completely inadequate in that it allowed cybercriminals to obtain and steal files containing a treasure trove of thousands of its clients' and employees' highly sensitive Private Information.

---

[26] *Id.*
[27] A copy of Plaintiff's Breach Notice is attached hereto as Exhibit A.
[28] Ex. A.
[29] *Id.*

54. Barnhart admitted to Plaintiff that that the following categories of his Private Information were stolen in the Data Breach:

a. Social Security number;

b. driver's license number;

c. driver's license state;

d. treatment information;

e. diagnosis information;

f. covid-19 vaccine/results, and;

g. health, dental, and vision insurance information.[30]

55. Through its inadequate security practices, Defendants exposed Plaintiff's and the Class's Private Information for theft and sale on the dark web.

56. Defendants acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, encouraging Plaintiff and the Class to take "precautionary measures" such as "placing a Fraud Alert and Security Freeze on your credit files, and obtaining a free credit report" and warning them to "remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity on a regular basis."[31]

57. Barnhart failed in its duties when its inadequate security practices caused the Data Breach. In other words, Barnhart's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the Private Information stored in its systems. And thus, Barnhart caused widespread injury and monetary damages.

---

[30] *Id.*
[31] *Id.*

58. Upon information and belief, Barnhart has offered complimentary credit monitoring services to Data Breach victims. However, this does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves Private Information that cannot be changed, such as Social Security numbers.

59. Even with several months of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' Private Information is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

60. Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's Private Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

***The Data Breach was a Foreseeable Risk of Which Defendants was on Notice.***

61. It is well known that Private Information, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

62. Indeed, in 2024, at least 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[32]

63. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have

[32] *2024 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter. org/publication/2024-data-breach-report/ (last visited March 24, 2025).

lesser IT defenses and a high incentive to regain access to their data quickly."[33]

64. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep Private Information private and secure, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

65. Defendants knew or should have known that Defendants' computer systems were a target for cybersecurity attacks, including ransomware attacks involving data theft, because warnings were readily available and accessible via the internet.

66. In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[34]

67. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms

---

[33] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited July 22, 2025).

[34] Catalin Cimpanu, *Ransomware mentioned in 1,000+ SEC filings over the past year*, ZDNET (Apr. 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

of extortion."[35]

68. This readily available and accessible information confirms that, prior to the Data Breach, Defendants knew or should have known that (i) ransomware actors were targeting entities such as Defendants, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendants, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

69. Thus, Defendants knew or should have known that they should have encrypted their clients' and employees' Social Security numbers and other sensitive data elements to protect against their publication and misuse in the event of a cyberattack.

***Plaintiff's Experience and Injuries***

70. Plaintiff is a former employee of Barnhart, having worked for Barnhart from on or around April 2021 to February 2024.

71. As a condition of employment with Barnhart, Plaintiff provided Defendants with his Private Information, including but not limited to his name, Social Security number, address, date of birth, driver's license and passport information, financial information to receive his paycheck, medical information, health insurance information, and contact information, including his telephone number and personal email address. Defendants used that Private Information to facilitate their employment of Plaintiff, including payroll, and required Plaintiff to provide that Private Information to obtain employment and payment for that employment.

72. Plaintiff provided his Private Information to Defendants and trusted that the company would use reasonable measures to protect it according to state and federal law.

---

[35] *Ransomware Guide*, U.S. CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited July 22, 2025).

73. On information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by Akira, Chaos, or by other cybercriminals on the dark web.

74. Plaintiff received Defendants' Breach Notice, dated May 21, 2026.[36]

75. Defendants deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by only notifying him about the Data Breach over a year after it occurred.

76. As a result of its inadequate cybersecurity, Defendants exposed Plaintiff's Private Information for theft by cybercriminals and sale and/or publication on the dark web.

77. In the aftermath of the Data Breach, Plaintiff's Private Information was used to apply for credit card accounts in is name. Plaintiff was forced to spend time contacting the banks where the accounts were opened and reporting the fraud.

78. On information and belief, Plaintiff's non-public Private Information, such as his Social Security number, was needed to perpetuate the fraud attempts described above.

79. Furthermore, in early May 2026, Plaintiff received notification that his Private Information was circulating on the dark web.

80. Moreover, in the aftermath of the Data Breach, Plaintiff began experiencing a significant increase in spam, scam, and phishing calls and texts, suggesting that his Private Information is now in the hands of cybercriminals. The spam, scam, and phishing communications Plaintiff is receiving are a distraction, must be blocked, and waste Plaintiff's time each day. Given the timing of the Data Breach, Plaintiff believes that the calls are related to his Private Information being stolen in the Data Breach.

81. Plaintiff suffered actual injury from the exposure of his Private Information —

[36] Ex. A.

which violates his rights to privacy.

82. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendants were required to adequately protect.

83. As a result of the Data Breach, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, and monitoring his credit information.

84. Plaintiff has already spent and will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

85. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff is especially concerned about the exposure and theft of his Social Security number, and what impact this will have. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

86. Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendants' failure to inform Plaintiff about the Data Breach.

87. Once an individual's Private Information is for sale and access on the dark web, as Plaintiff's Private Information is here as a result of the Data Breach, cybercriminals are able to use

the stolen and compromised to gather and steal even more information.[37] On information and belief, the scam, spam and phishing calls and texts Plaintiff is experiencing are a result of the Data Breach.

88. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

89. Plaintiff and members of the proposed Class have suffered injury from the misuse of their Private Information that can be directly traced to Defendants.

90. As a result of Defendants' failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the class have suffered or are at an increased risk of suffering:

a. The loss of the opportunity to control how their Private Information is used;

b. The diminution in value of their Private Information;

c. The compromise and continuing publication of their Private Information;

d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft

---

[37] Ryan Toohil, *What do Hackers do with Stolen Information*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

and fraud;

f. Delay in receipt of tax refund monies;

g. Unauthorized use of stolen Private Information; and

h. The continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fails to undertake the appropriate measures to protect the Private Information in its possession.

91. Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen Private Information can be worth up to $1,000.00 depending on the type of information obtained.

92. The value of Plaintiff's and the proposed Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

93. Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

94. It can take victims years to spot identity or Private Information theft, giving criminals plenty of time to use that information for cash.

95. One such example of criminals using Private Information for profit is the development of "Fullz" packages.

96. Cyber-criminals can cross-reference two sources of Private Information to marry

unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

97. The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and members of the Class's stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

98. Defendants disclosed the Private Information of Plaintiff and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the Private Information of Plaintiff and the Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen Private Information.

99. Defendants' failure to properly notify Plaintiff and the Class of the Data Breach exacerbated Plaintiff's and the Class's injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

***Consumers Prioritize Data Security***

100. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[38] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[39]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[40]

c. 89% of consumers stated that "I care about data privacy."[41]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[42]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[43]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[44]

---

[38] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[39] *Id*. at 3.
[40] *Id*.
[41] *Id*. at 9.
[42] *Id*.
[43] *Id*.
[44] *Id*. at 11.

101. Defendants knew or should have known that adequate implementation of cybersecurity and protection of Private Information, including Plaintiff and the Class's Private Information, was important to its clients and employees.

***Defendants failed to adhere to FTC guidelines.***

102. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendants, should employ to protect against the unlawful exposure of Private Information.

103. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business. The guidelines explain that businesses should:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

104. The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

105. The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

106. The FTC has brought enforcement actions against businesses for failing to

adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

107. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to clients' and employees' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

108. Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendants. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

109. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

110. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10,

PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

111. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

**CLASS ACTION ALLEGATIONS**

112. Plaintiff sues on behalf of himself and the proposed nationwide class ("Class, defined as follows, pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3):

> All individuals residing in the United States whose Private Information was compromised in the Data Breach, including all those who received notice of the breach.

113. Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any of Defendants' officers or directors, any successors, and any Judge who adjudicates this case, including their staff and immediate family.

114. Plaintiff reserves the right to amend the class definition.

115. This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

a. **Numerosity**. Plaintiff is representative of the Class, consisting of 22,822 members, far too many to join in a single action;

b. **Ascertainability**. Members of the Class are readily identifiable from information in Defendants' possession, custody, and control;

c. **Typicality**. Plaintiff's claims are typical of class claims as each arises from the same Data Breach, the same alleged violations by Defendants, and the same unreasonable manner of notifying individuals about the Data Breach.

d. **Adequacy**. Plaintiff will fairly and adequately protect the proposed Class's interests. His interests do not conflict with the Class's interests, and he has retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

e. **Commonality**. Plaintiff's and the Class's claims raise predominantly common fact and legal questions that a class wide proceeding can answer for the Class. Indeed, it will be necessary to answer the following questions:

i. Whether Defendants had a duty to use reasonable care in safeguarding Plaintiff's and the Class's Private Information;

ii. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

iii. Whether Defendants were negligent in maintaining, protecting, and securing Private Information;

iv. Whether Defendants breached contract promises to safeguard Plaintiff's and the Class's Private Information;

v. Whether Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

vi. Whether Defendants' Data Breach Notice was reasonable;

vii. Whether the Data Breach caused Plaintiff's and the Class's injuries;

viii. What the proper damages measure is; and

ix. Whether Plaintiff and the Class are entitled to damages, treble damages, or injunctive relief.

116. Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

**FIRST CLAIM FOR RELIEF**
**Gross Negligence**
**(On Behalf of Plaintiff and the Class)**

117. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

118. Plaintiff and the Class entrusted their Private Information to Defendants on the premise and with the understanding that Defendants would safeguard their Private Information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

119. Defendants knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

120. Defendants owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security—would compromise their Private Information in a data breach. And here, that foreseeable danger came to pass.

121. Defendants have full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if their Private Information was wrongfully disclosed.

122. Defendants owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiff and Class Members' Private Information.

123. Defendants owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the Private Information in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their Private Information.

124. Thus, Defendants owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

125. Defendants also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain under applicable regulations.

126. Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiff and the Class

involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

127. Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendants with their confidential Private Information, a necessary part of obtaining services from Defendants.

128. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendants hold vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the Private Information —whether by malware or otherwise.

129. Private Information is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

130. Defendants improperly and inadequately safeguarded the Private Information of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

131. Defendants breached these duties as evidenced by the Data Breach.

132. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' Private Information by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

133. Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

134. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

135. Defendants have admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

136. The specific reckless and grossly negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems and to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information; and

c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards.

d. Failing to detect the breach at the time it began or within a reasonable time thereafter; and

e. Failing to follow their own privacy policies and practices published to their employees and residents.

137. Defendants' conduct went far beyond ordinary negligence. Defendants acted with gross negligence by consciously and recklessly disregarding known risks to Plaintiff's Private Information, including by failing to implement basic and industry-standard cybersecurity measures, failing to adequately monitor its systems for unauthorized access, failing to remediate

known security vulnerabilities, failing to properly train employees on data security, and failing to timely detect and prevent the Data Breach. Defendants knew or should have known that their inadequate data-security practices created a high probability of harm to Plaintiff and the Class, yet Defendants consciously failed to take reasonable steps to prevent that harm.

138. Defendants' grossly negligent conduct demonstrated a substantial lack of concern for whether injury would result to Plaintiff and the Class. Defendants' actions and omissions constituted a reckless indifference to the rights, safety, and interests of Plaintiff and the Class, whose sensitive personal and medical information Defendants were entrusted to protect.

139. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendants' systems.

140. As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

141. And, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

142. Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants'

negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CLAIM FOR RELIEF**
**Negligence *Per Se***
**(On Behalf of Plaintiff and the Class)**

143. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

144. Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

145. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff and the Class Members' sensitive Private Information.

146. Defendants breached their respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Private Information.

147. Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

148. The harm that has occurred is the type of harm the FTC Act is intended to guard

against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

149. But for Defendants' wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

150. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that Defendants were failing to meet their duties and that their breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their Private Information.

151. Defendants' various violations and their failure to comply with applicable laws and regulations constitute negligence *per se*.

152. As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CLAIM FOR RELIEF**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

153. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

154. Defendants offered to provide services to or employ Plaintiff and members of the Class if, as a condition of receiving those services or of employment, Plaintiff and members of the Class provided Defendants with their Private Information.

155. In turn, Defendants agreed they would not disclose the Private Information they collect to unauthorized persons. Defendants also promised to safeguard their clients' and employees' Private Information.

156. Plaintiff and the members of the Class accepted Defendants' offers by providing

Private Information to Defendants in exchange for services from Defendants or for employment with Defendants.

157. Implicit in the parties' agreements was that Defendants would provide Plaintiff and members of the Class with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

158. Plaintiff and the members of the Class would not have entrusted their Private Information to Defendants in the absence of such an agreement with Defendants.

159. Defendants materially breached the contracts they had entered with Plaintiff and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Defendants also breached the implied contracts with Plaintiff and members of the Class by:

a. Failing to properly safeguard and protect Plaintiff's and members of the Class's Private Information;

b. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

c. Failing to ensure the confidentiality and integrity of electronic Private Information that Defendants created, received, maintained, and transmitted.

160. The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendants' material breaches of their agreement(s).

161. Plaintiff and members of the Class have performed under the relevant agreements, or such performance was waived by the conduct of Defendants.

162. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act

with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

163. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

164. Defendants failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

165. In these and other ways, Defendants violated their duty of good faith and fair dealing.

166. Plaintiff and members of the Class have sustained damages because of Defendants' breaches of their agreements, including breaches of it through violations of the covenant of good faith and fair dealing.

167. Plaintiff, on behalf of himself and the Class, seeks compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of the Plaintiff and the Class)**

168. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

169. This claim is plead in the alternative to the breach of implied contractual duty claim.

170. Plaintiff and members of the Class conferred a benefit upon Defendants in the form of services through employment. Defendants also benefited from the receipt of Plaintiff's and the

Class's Private Information, as this was used to facilitate their employment.

171. Defendants appreciated or had knowledge of the benefits conferred upon itself by Plaintiff and members of the Class.

172. Under principals of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and the proposed Class's services and their Private Information because Defendants failed to adequately protect their Private Information. Plaintiff and the proposed Class would not have done business with Defendants, provided their Private Information or worked for Defendants at the payrates they did had they known Defendants would not adequately protect their Private Information.

173. Defendants should be compelled to disgorge into a common fund to benefit Plaintiff and members of the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged here.

**FIFTH CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(On Behalf of the Plaintiff and the Class)**

174. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

175. Given the relationship between Defendants and Plaintiff and Class members, where Defendants became guardian of Plaintiff's and Class members' Private Information, Defendants became a fiduciary by their undertaking and guardianship of the Private Information, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff's and Class members' Private Information; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and does store.

176. Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendants' relationship with them—especially to

secure their Private Information.

177. Because of the highly sensitive nature of the Private Information, Plaintiff and Class members would not have entrusted Defendants, or anyone in Defendants' position, to retain their Private Information had they known the reality of Defendants' inadequate data security practices.

178. Defendants breached their fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' Private Information.

179. Defendants also breached their fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

180. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**SIXTH CLAIM FOR RELIEF**
**Declaratory Judgment Act**
**28 U.S.C. §§ 2201, *Et Seq.***
**(On Behalf of Plaintiff and the Class)**

181. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

182. This is a claim declaratory relief for Plaintiff and the Class.

183. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

184. Defendants owed a duty of care to Plaintiff and Class Members, which required Defendants to adequately monitor and safeguard Plaintiff's and Class Members' Private Information.

185. Defendants still possess the Private Information belonging to Plaintiff and Class Members.

186. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

187. As a result of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security.

188. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure Plaintiff's and Class Members' Private Information under the common law, the FTC Act, and other state and federal laws and regulations, as set forth herein;

b. Defendants' existing data monitoring measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect individuals' Private Information; and

c. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Plaintiff's and Class Members' Private Information.

189. The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security protocols consistent with legal and industry standards to protect the data entrusted to it.

190. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy to prevent another data breach of Defendants' computer systems. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

191. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff's and Class Members' injuries.

192. The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. The cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal duty to employ such measures.

193. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach of Defendants' systems and network, thus preventing future injury to Plaintiff and to other Class Members whose Private Information would be further compromised.

194. Following the issuance of the declaratory relief requested herein, pursuant to 28 U.S.C. § 2202, Plaintiff and Class Members will seek any further necessary or proper relief, including damages, after reasonable notice and hearing, against Defendants.

## PRAYER FOR RELIEF

Plaintiff and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent

the Class;

B. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

D. Enjoining Defendants from further deceptive practices and making untrue statements about the Data Breach and the stolen Private Information;

E. Awarding Plaintiff and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J. Granting such other or further relief as may be appropriate under the circumstances.

**JURY DEMAND**

Plaintiff hereby demands that this matter be tried before a jury on all issues so triable.

Dated: May 28, 2026

Respectfully submitted,

*/s/ Grayson Wells*

J. Gerard Stranch, IV (TN BPR 23045)
Grayson Wells (TN BPR 039658)
John C. Roberts (TN BPR 042673)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Ave., Suite 200

Nashville, TN 37203
Tel: (615) 254-8801
gwells@stranchlaw.com
jroberts@stranchlaw.com

Raina Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Tel: (872) 263-1100
raina@straussborrelli.com

**** Pro hac vice forthcoming***

***Attorneys for Plaintiff and Proposed Class***